UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| TIA MASON, et al., | ) | CASE NO. 4:12CV2717 |
| | ) | |
| Plaintiffs, | ) | MAGISTRATE JUDGE. |
| | ) | GEORGE J. LIMBERT |
| v. | ) | |
| | ) | |
| | ) | |
| PATROLMAN BRYAN HOLMES, et al., | ) | **MEMORANDUM OPINION & ORDER** |
| | ) | |
| Defendants. | ) | |

This matter is before the Court on a motion for summary judgment filed by Defendants, City of Warren Police Officer Bryan Holmes ("Officer Holmes") and the City of Warren Police Department ("Warren PD")(collectively "Defendants") on December 6, 2013.  ECF Dkt. #67. Plaintiffs Tia Mason, and Tia Mason as mother and next friend of minor child Demetrius Whitson, ("Plaintiffs), filed a brief in opposition to the motion on January 3, 2014. ECF Dkt. #71. Defendants filed a reply brief on January 9, 2014.  ECF Dkt. #73.

For the following reasons, the Court GRANTS Defendants' motion for summary judgment and DISMISSES Plaintiffs' complaint in its entirety with prejudice.  ECF Dkt. #67.

## I. FACTS

The parties agree to the following facts. On June 13, 2011 at 12:50 a.m., the Warren PD dispatched Officer Holmes and Officer Laprocina in separate vehicles to a Warren, Ohio address after a 911 call from the address reported a family disturbance.  ECF Dkt. #2 at 3; ECF Dkt. #71 at 2.  Larry Davis, Plaintiff's cousin, had called 911 regarding an altercation he had with Plaintiff's mother, Latonya Mason, and he reported that she had a knife.  *Id.*  Mr. Davis later admitted that Latonya Mason did not have a knife, but he testified that he genuinely feared for his safety and told the 911 dispatcher about a knife because he wanted police to respond more quicky than they had in the past. ECF Dkt. #65-1 at 6-8.  Latonya Mason also had active warrants out for her arrest and this was made known to responding officers.  ECF Dkt. #2 at 3; ECF Dkt. #67 at 2.  Officer Holmes and Officer Laprocina arrived on the scene where at least five to eight people were in the house.  *Id.*

Officer Holmes spoke to Latonya Mason, the loudest and most agitated person at the house, outside on the front porch. *Id*. ECF Dkt. #71 at 3.  He asked her if she had a knife.  *Id*.  She responded that she did not.  *Id*.  Officer Holmes had a taser and threatened to use it on Latonya Mason because she was not following his commands to put her hands behind her back.  *Id*.  He did not use the taser and he arrested and handcuffed Latonya Mason based on an active warrant.  *Id*.

The rest of the facts surrounding Plaintiff's arrest are largely in dispute.  Plaintiff alleges that during her mother's arrest, she yelled at Officer Holmes and begged him not to use the taser on her mother.  ECF Dkt. #2 at 3.  She testified that she never went outside of the house and she yelled expletives at Officer Holmes from the common area inside the house.  *Id*.  Officer Holmes testified that while he was arresting Latonya Mason, he had one handcuff on her when he saw something moving toward him out of his peripheral vision and realized that it was Plaintiff, so he put up his elbow to shield himself.  ECF Dkt. #67 at 4.  He indicated that Officer Laprocina grabbed Plaintiff's arm and stopped her from getting closer to him so that he was able to finish handcuffing Latonya Mason.  *Id.*  Officer Holmes indicated that he was under the impression that he was going to be assaulted and Plaintiff had interfered with his arrest of her mother.  ECF Dkt. #64-1 at 40. He stated that he finished handcuffing Latonya Mason and as Plaintiff was walking back into the house, past Officer Laprocina, he told Officer Laprocina to "take her, right now, take her," indicating that Plaintiff should be arrested.  *Id*.

Officer Holmes further testified that he and Officer Laprocina followed Plaintiff into the house as she was walking back to a dimly lit hallway into a back room.  ECF Dkt. #64-1 at 40. Plaintiff alleges that she told the officers that she had a baby in the back room and she went to check on him.  ECF Dkt. #2 at 4.  Officer Holmes testified that they followed Plaintiff and as they approached her, he told her that she was under arrest and he verbally commanded her to put her hands behind her back.  *Id.*  He stated that Plaintiff refused to comply and instead argued with them. *Id*.  He testified that Officer Laprocina tried to take Plaintiff's elbow to bring her arms behind her back to handcuff her, but she struggled and moved her arm around, swinging it so that the officer could not move her arms back.  *Id.*

Officer Holmes asserts that he had the taser in his hand and he warned Plaintiff that if she did not comply, he was going to use the taser. ECF Dkt. #67 at 4. After Plaintiff did not comply, Officer Holmes tasered Plaintiff on the collarbone. *Id*. According to Officer Holmes, even after he used the taser, Plaintiff continued arguing and resisting, so he tasered her again and repeated his commands. *Id*. at 5. Officer Holmes stated that he gave Plaintiff time to comply, but she did not do so. *Id*. According to Defendants, the officers and Plaintiff then fell to the ground and Officer Holmes applied the taser a third time to Plaintiff. *Id*. They were then able to handcuff Plaintiff and arrest her. *Id*.     Plaintiff asserts that she saw Larry Davis sneak upstairs and presumed that he called the police because when he came back downstairs, he told her mom that she was going to jail. ECF Dkt. #66-1 at 37. She stated that she saw Larry come back downstairs and he had something in his hand, which could have been a gun because he had threatened to go upstairs and get a gun. *Id.* She testified that she saw the police pulling up to the house. *Id*. at 43. She stated that the officers approached her first and asked if she was the person with the knife and gun who was fighting. *Id*. at 44. She testified that she responded no to them and told them to leave her alone. *Id.* She stated that the officers then asked her who Latonya Mason was and then asked her mom to step outside. *Id.* She testified that she was looking outside and saw Officer Holmes about to taser her mother, so she started screaming and hollering and he told her to shut up and mind her own business. *Id*. at 45.

Plaintiff further testified that she then stated that she was going to call her lawyer and she went out of the common area, away from the door where Officer Holmes and her mother were outside on the porch, and into the back room of the house to look for her phone. ECF Dkt. #66-1 at 46. She stated that she got on her knees to look for her phone and moved Demetrius, her baby, off of the couch in the back room. *Id.* She testified that five to seven minutes later, she felt a pain and realized that she was being tasered on her collarbone. *Id.* She stated that she then said, "my baby, my baby," and officers said that there was "no effing baby here. We are tired of you and your smart mouth." *Id.* Plaintiff related that she was then screaming and the next thing she knew, she was on the ground and one of the officers kicked her baby in the head. *Id.* She testified that she then really started crying "and saying a bunch of stuff, like I'm suing y'all. You kicked my baby." *Id.* She stated some other things and then testified that "[a]nd then they started tasing me like eight times,

seven or eight times." *Id*. at 46-47.  She testified that she was tasered without any warning as the officers came up behind her as she was looking for her phone and said nothing to her. *Id*. at 60.  She testified that for all but two of the times that she was tasered, she was in handcuffs.  *Id*. at 65.  She said neither of the officers ever told her that she was under arrest.  *Id.* at 68.

In her complaint, Plaintiff alleges that she was tasered at least five times.  ECF Dkt. #2 at 4.  In her brief in opposition to the motion for summary judgment, Plaintiff stated that she was tasered at least three times and in her deposition, she testified that she was tasered eight times.  ECF Dkt. #66-1 at 47; ECF Dkt. #71 at 5.  She also stated that she was tasered by both officers and after she was handcuffed, even though she did not resist arrest or obstruct official business.  ECF Dkt. #71 at 3-5.  She further stated that officers kicked or stepped on her baby after ignoring her warnings that her baby was in the room where she was tased.  *Id*. at 4-5.  She avers in her complaint that "the effects of the taser on Tia Mason injured her baby as she tried to reach him."  *Id*.  Defendants assert that after Plaintiff was handcuffed, Holmes heard Plaintiff say something about her baby and they did not know a baby was in the room where the struggle occurred.  ECF Dkt. #67 at 5.  Officer Holmes indicated that he was not aware of anyone stepping or kicking a baby and after the incident, family members told officers that the baby was not harmed.  *Id*. at 5-6.

Plaintiff was charged with obstructing official business and resisting arrest.  ECF Dkt. #67. at 1. ECF Dkt. #71 at 2.  She entered a no contest plea to disorderly conduct.  *Id*.

In her complaint, Plaintiff alleges under 42 U.S.C. § 1983 that Defendants violated her Fourth and Fourteenth Amendment rights by arresting her for no reason and by using excessive force with the taser, which caused harm to her and her baby.  ECF Dkt. #2 at 5.

The Court has reviewed a DVD attached to Defendants' motion for summary judgment.  ECF Dkt. #67-2.  The DVD is from a mobile video recording system that Officer Holmes' cruiser contained which video recorded everything in front of the police cruiser.  ECF Dkt. #67 at 6.  However, Officer Holmes parked his cruiser in the street, so no video shows the incident in this case, but he was wearing a body microphone that recorded the audio around him at the time, including Plaintiff's arrest and tasering.  *Id.*

-4-

## II.    STANDARD OF REVIEW

Summary judgment should be granted "if the movant shows there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a). A party asserting that a fact cannot be or is genuinely disputed must support the assertion by:

> (A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or
>
> (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.

Fed.R.Civ.P. 56(c).

This Court must view evidence in the light most favorable to the non-moving party to determine whether a genuine issue of material fact exists. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970); *CenTra, Inc. v. Estrin*, 538 F.3d 402, 412 (6th Cir.2008). A fact is "material" only if its resolution will affect the outcome of the lawsuit. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Daugherty v. Sajar Plastics*, Inc., 544 F.3d 696, 702 (6th Cir.2008). Determination of whether a factual issue is "genuine" requires consideration of the applicable evidentiary standards. Thus, in most civil cases, the Court will decide "whether reasonable jurors could find by a preponderance of the evidence that the [non-moving party] is entitled to a verdict." *Anderson*, 477 U.S. at 252.

Upon filing a motion for summary judgment, the moving party has the initial burden of establishing that there are no genuine issues of material fact as to an essential element of the nonmoving party's claim. *Moldowan v. City of Warren*, 578 F.3d 351, 374 (6th Cir.2009) (citation omitted); *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479–80 & n. 12 (6th Cir.1989). The moving party, however, is not required to file affidavits or other similar materials negating a claim on which its opponent bears the burden of proof, so long as the moving party relies upon the absence of the essential element in the pleadings, depositions, answers to interrogatories, and admissions on file. *Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

-5-

In response, if the moving party establishes the absence of a genuine issue of material fact, in order to defeat summary judgment, the non-moving party "may not rely merely on allegations or denials in its own pleading; rather, its response must – by affidavits or as otherwise provided in this rule—set out specific facts showing a genuine issue for trial." Fed.R.Civ.P. 56(e)(2); *see also Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); *Alexander v. CareSource*, 576 F.3d 551, 558 (6th Cir.2009) (citation omitted). In this regard, "Rule 56 does not impose upon the district court a duty to sift through the record in search of evidence to support a party's opposition to summary judgment"; rather, "Rule 56 allocates that duty to the opponent of the motion, who is required to point out the evidence, albeit evidence that is already in the record, that creates an issue of fact." *Williamson v. Aetna Life Ins. Co.*, 481 F.3d 369, 379–80 (6th Cir.2007) (citation omitted); *see also Tucker v. Tennessee*, 539 F.3d 526, 531 (6th Cir.2008)(citation omitted). Moreover, the non-moving party must show more than a scintilla of evidence to overcome summary judgment; it is not enough for the non-moving party to show that there is some metaphysical doubt as to material facts. *Matsushita Elec. Indus. Co.*, 475 U.S. at 586–87, 106 S.Ct. 1348; see also *Barr v. Lafon*, 538 F.3d 554, 574 (6th Cir.2008).

Accordingly, the ultimate inquiry is whether the record, as a whole, and upon viewing it in the light most favorable to the non-moving party, could lead a rational trier of fact to find in favor of the non-moving party. *Matsushita Elec. Indus. Co.*, 475 U.S. at 586–87, 106 S.Ct. 1348; *see also Anderson*, 477 U.S. at 252 ("The judge's inquiry, therefore, unavoidably asks whether reasonable jurors could find by a preponderance of the evidence that the [non-moving party] is entitled to a verdict—whether there is [evidence] upon which a jury can properly proceed to find a verdict for the party producing it, upon whom the onus of proof is imposed." (emphasis in original) (internal quotations omitted)).

"If the defendant successfully demonstrates, after a reasonable period of discovery, that the plaintiff cannot produce sufficient evidence beyond the bare allegations of the complaint to support an essential element of his or her case, summary judgment is appropriate." *Combs v. Int'l Ins. Co.,* 354 F.3d 568, 576 (6th Cir.2004) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986)).

-6-

In *Scott v. Harris*, 550 U.S. 372, 380, 127 S.Ct. 1769, 167 L.Ed.2d 686 (2007), the United States Supreme Court held that "[w]hen opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." In *Scott*, the plaintiff alleged that the police officer used excessive force when he rammed his bumper into the plaintiff's car in order to terminate a car chase. *Id.* at 381. The plaintiff was rendered a quadriplegic as a result of the crash. *Id.* The plaintiff had asserted that when the officer rammed his car, little threat existed to pedestrians and other motorists because the roads were mostly clear and he was in control of his car. *Id.* at 378. The appellate court adopted these assertions, reasoning that the summary judgment standard required it to take facts from the non-movant's viewpoint. *Id.* at 379.

However, the Supreme Court held that the videotape told a completely different story as the plaintiff's car was racing down narrow, two-lane roads, swerving and forcing cars traveling in both directions to the shoulders of the street to avoid being hit, running red lights and traveling in the occasional center left-turn only lane. *Scott*, 550 U.S. at 379. The Court reiterated the summary judgment standard that facts must be viewed in a light most favorable to the non-moving party only if there is a "genuine" dispute as to those facts. *Id.*, citing Fed. R. Civ. P. 56(c). But the Court found that the videotape showed that the plaintiff's version of the facts "is so utterly discredited by the record that no reasonable jury could have believed him." *Id.* at 380. Thus, the Court found that the appellate court should have viewed the facts in the light depicted by the videotape. *Id.* at 381.

In *Coble v. City of White House, Tennessee*, 634 F.3d 865, 869 (6th Cir. 2011), the Sixth Circuit Court of Appeals applied the *Scott* holding to an audio recording of an incident that blatantly discredited the arrestee's version of events. The Sixth Circuit held that nothing in *Scott* limited its holding to cases only involving videotapes. *Id.* at 868-869. While finding that Scott could apply to audio recordings, the Court found that the district court had erred in finding that the lack of sounds on an audio recording could be used to discount the plaintiff's testimony that the facts differed from what was recorded. *Id.* at 869-870. The Court found that an audio recording

> may very well provide objectively compelling evidence, particularly when it is presented to show what sounds or statements were made. [citation omitted].

-7-

>However, an audio recording is less reliable when it is presented to support findings based on the lack of recorded sound.

Id. at 870, n.4.  The *Coble* Court further held that when a video or audio recording only partially contradicts a plaintiff's testimony, "that does not permit the district court to discredit his entire version of the events." *Id*. at 870.

### III.     LAW AND ANALYSIS

#### A.     SECTION 1983 CLAIMS AND QUALIFIED IMMUNITY

"Every person who, under color of ... [state law], subjects, or causes to be subjected, any citizen of the United States ... to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured." 42 U.S.C. §1983. "Qualified immunity," however, "shields federal and state officials from money damages unless a plaintiff pleads facts showing (1) that the official violated a statutory or constitutional right, and (2) that the right was 'clearly established' at the time of the challenged conduct." *Ashcroft v. al-Kidd*, __U.S.__, 131 S.Ct. 2074, 2080, 179 L.Ed.2d 1149 (2011). This doctrine "balances two important interests – the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." *Pearson v. Callahan*, 555 U.S. 223, 231, 129 S.Ct. 808, 172 L.Ed.2d 565 (2009).

Qualified immunity is an affirmative defense. Accordingly, the defendant bears the burden of pleading it in the first instance. *Lanman v. Hinson*, 529 F.3d 673, 683 (6th Cir.2008); *Sheets v. Mullins*, 287 F.3d 581, 586 (6th Cir.2002). Once the defendant raises qualified immunity, however, the burden shifts to the plaintiff, who must demonstrate both that the official violated a constitutional or statutory right, and that the right was so clearly established at the time of the alleged violation "that every reasonable official would have understood that what he [was] doing violate[d] that right." *al-Kidd*, 131 S.Ct. at 2083 (quotation marks omitted). "If the plaintiff fails to carry this burden as to either element of the analysis, qualified immunity applies" and the state official is immune from the plaintiff's suit. *Cockrell v. City of Cincinnati*, 468 Fed.Appx. 491, 494 (6th Cir.2012).

-8-

### B.  CLAIMS AGAINST OFFICER HOLMES

### 1.  ARREST AS UNREASONABLE SEIZURE

Defendants move for summary judgment on Plaintiff's complaint that Officer Holmes violated her Fourth and Fourteenth Amendment rights to be free from an unreasonable seizure when he arrested her.  ECF Dkt. #67 at 8.  Defendants assert that Officer Holmes is entitled to qualified immunity on this claim because Plaintiff entered a no contest plea to the criminal charges filed against her which is an implicit admission that officers had probable cause to arrest her.  *Id.*, citing *Daubenmire v. City of Columbus*, 507 F.3d 383, 390 (6th Cir. 2007) and *Walker v. Schaeffer*, 854 F.2d 138, 142 (6th Cir. 1988).

The Court GRANTS Defendants' motion for summary judgment as to Plaintiff's claims of false imprisonment, false arrest and/or lack of probable cause for arresting her.  ECF Dkt. #67.  The Sixth Circuit Court of Appeals has interpreted Ohio law as barring plaintiffs from litigating false imprisonment claims where they pleaded no contest to charges of disorderly conduct in state court. *See Jackim v. Sam's East, Inc.*, Nos. 07-3514, 08-4701, 378 Fed. App'x 556, 561, 2010 WL 2101962 (6th Cir. May 25, 2010), unpublished, citing *Walker*, 854 F.2d 138 (plaintiff's no contest plea in state court collaterally estopped her pursuit of § 1983 action for unlawful seizure based upon lack of probable cause for arrest as she conceded existence of probable cause in no contest plea).

### 2.  TASERING AS EXCESSIVE FORCE

Defendants also move for summary judgment on Plaintiff's claim that Officer Holmes used excessive force against her during her arrest and after she was handcuffed.  ECF Dkt. #67 at 9-15. Defendants contend that the force that Officer Holmes employed against Plaintiff was reasonable and he is entitled to qualified immunity.  *Id.* at 13-15.

The Court notes that Defendants rely upon the holding in *Scott* to urge the Court to disregard Plaintiff's testimony in full.  ECF Dkt. #67 at 11.  Defendants contend that the Court should not accept any facts regarding Plaintiff's version of the events surrounding the use of force because it is so markedly different from and "completely and utterly disproven" by the audio recording.  *Id*. The Court is persuaded by Defendants' argument.  Accordingly, the Court declines to consider the facts in the light most favorable to Plaintiff.

Here, the audio recording clearly refutes Plaintiff's version of the facts leading up to and surrounding her arrest. ECF Dkt. 67-2 at 5:16 through 5:50. Plaintiff had testified that she did not go outside on the front porch when her mother and Officer Holmes were speaking. ECF Dkt. #66-1 at 54. However, while speaking with Latonya Mason outside on the front porch, Plaintiff's voice is heard continuously during their conversation and Officer Holmes then says, "go back inside" three times to which Plaintiff responded "Oh wow." *Id.* at 3:27 through 3:28. Further, contrary to Plaintiff's assertion that Officer Holmes did not feel the need to call for backup, the audio recording reveals that he did call for back up as he told dispatch on his recording device that they could "probably use an extra body." *Id.* at 3:40 through 3:50. Officer Holmes is heard thereafter telling Officer Laprocina, the only other officer at the scene at that time, to "take her," supporting Officer Holmes' assertion that he intended to arrest Plaintiff. ECF Dkt. #67-2 at 5:01 through 5:02.

The audio recording further contradicts Plaintiff's testimony that a lapse of five to seven minutes occurred from when she left the common room until she was tasered by Officer Holmes in the back room. ECF Dkt. #66-1 at 58-59. Further contradicting Plaintiff's testimony, the audio recording establishes that Officer Holmes told Plaintiff three times that she was under arrest. ECF Dkt. #66-1 at 68; ECF Dkt. # 67-2 at 5:12 through 5:13. Most importantly, the audio recording establishes that Officer Holmes on at least eight occasions ordered Plaintiff to put her hands behind her back after telling her that she was under arrest. ECF Dkt. #67-2 at 5:14 through 5:50.

Even if the Court does not consider the facts in light of audio recording, and instead considers the facts in a light most favorable to Plaintiff, Officer Holmes is entitled to qualified immunity as to his use of the taser on Plaintiff.

"All claims that police officers used excessive force in the course of an arrest should be analyzed under the Fourth Amendment and its 'objective reasonableness' standard." *Bennett v. Krakowski*, 671 F.3d 553, 561 (6th Cir.2011) (citing *Graham v. Connor*, 490 U.S. 386, 397, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989)). To determine whether an officer's use of force was objectively reasonable, we consider the totality of the circumstances "from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Graham*, 490 U.S. at 396. The Court must pay "careful attention to the facts and circumstances of ... [the] case, including the

-10-

severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Id.* Throughout this analysis, the Court must remember that police officers do not sit in an ivory tower. They "are often forced to make split-second judgments – in circumstances that are tense, uncertain, and rapidly evolving – about the amount of force that is necessary in a particular situation." *Id.* at 397. The calculus "must embody allowance" for these difficult working conditions. *Id.* at 396-97.          "As in other Fourth Amendment contexts . . .the 'reasonableness" inquiry. . .is an objective one:  the question is whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." *Graham*, 490 U.S. at 397.  Thus, "[i]f an officer reasonably, but mistakenly, believed that a suspect was likely to fight back, for instance, the officer would be justified in using more force than in fact was needed." *Saucier v. Katz*, 533 U.S. 194, 205, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001), overruled on other grounds by *Pearson*, 555 U.S. at 236–37.

However, "once a suspect is passively complying with an officer's commands, that suspect has a clearly established right to be free from force beyond what is necessary to carry out the arrest." *Cole v. City of Dearborn*, 448 F. App'x 571, 576 (6th Cir.2011). "Cases in this circuit clearly establish the right of people who pose no safety risk to the police to be free from gratuitous violence during arrest ." *Id.* "In determining whether there has been a violation of the Fourth Amendment, we consider not the extent of the injury inflicted but whether an officer subjects a detainee to gratuitous violence." *Miller v. Sanilac Cnty.*, 606 F.3d 240, 252 (6th Cir.2010) (citations and internal quotation marks omitted).

Plaintiff asserts in her complaint that Officer Holmes used unnecessary physical force in arresting her. ECF Dkt. #2 at 5. She elaborates in her opposition brief to the motion for summary judgment that she did not resist arrest and she was tasered after Officer Holmes had already handcuffed her. ECF Dkt. #71 at 5. She contends that she was not a threat to officers. *Id.* at 6.

The reasonableness of an officer's use of a taser depends on whether the suspect is actively resisting. "It is clearly established that suspects have the right to be free from tasing where they are fully compliant with officers' orders, not resisting arrest, or immobilized and posing no threat of

-11-

danger." *Watson v. City of Marysville*, No. 12–3478, 2013 WL 1224089, at *3 (6th Cir. Mar.26, 2013) (unpublished) (citing *Hagans v. Franklin Cnty. Sheriff's Office*, 695 F.3d 505, 509 (6th Cir.2012)). However, "[i]f a suspect actively resists arrest and refuses to be handcuffed, officers do not violate the Fourth Amendment by using a [T]aser to subdue him," even if the Taser is used repeatedly. *Hagans*, 695 F.3d at 509. The Sixth Circuit held in *Hagans* that "[c]ases from this circuit and others, before and after May 2007, adhere to this line: If a suspect actively resists arrest and refuses to be handcuffed, officers do not violate the Fourth Amendment by using a taser to subdue him." *Id*.

The Court finds that Officer Holmes' tasering of Plaintiff was objectively reasonable. The audio recording clearly revealed that Plaintiff repeatedly failed to comply with his orders to put her hands behind her back after he told her that she was under arrest. ECF Dkt. #67-2 at 5:14 through 5:58. Even after the taser cycling sounds are heard, Officer Holmes continued to tell Plaintiff to put her hands behind her back, indicating that Plaintiff still resisted his orders. *Id*. Applying the *Graham* factors, the crimes at issue in this case were severe as the officers were initially dispatched to the residence for a reported domestic disturbance with a knife involved, Plaintiff interrupted Officer Holmes' arrest of her mother, the main suspect, and Plaintiff continuously refused to comply with the officers' orders to put her hands behind her back after she was told that she was under arrest and after she was tasered. Further, numerous people were in the house which concerned Officer Holmes from the beginning since he requested backup shortly after his arrival on the scene. The fact that Plaintiff was yelling and screaming and failing to comply with the officers' multiple requests to put her hands behind her back to be handcuffed posed a threat to the officers and to others in the house. For these reasons, the Court finds that Officer Holmes' tasering of Plaintiff was reasonable. Moreover, Plaintiff has produced insufficient evidence to show that Officer Holmes is not entitled to qualified immunity under the circumstances that existed at the time that she was tasered. No reasonable juror could conclude based upon the totality of the circumstances that Officer Holmes' actions were objectively unreasonable due to the uncertainties surrounding him at the time.

### 3.        EXCESSIVE FORCE AGAINST DEMETRIUS

Defendants further move for summary judgment on Plaintiff's claims on behalf of her baby that Officer Holmes violated his right to be free from excessive force when he stepped on or kicked the baby during his arrest of Plaintiff. ECF Dkt. #71 at 4. On the audio recording, Plaintiff can be heard screaming something about her baby while Officer Holmes is telling her that she is under arrest and to put her hands behind her back. ECF Dkt. #67-2 at 5:15 through 5:18. Plaintiff did not address Defendants' summary judgment argument as to dismissing Demetrius' claims against Officer Holmes. ECF Dkt. #71. Very few references are made to the incident involving Demetrius. Plaintiff stated in her opposition brief to the motion for summary judgment that the "Officers" showed reckless disregard by ignoring Plaintiff Tia Mason's verbal warning that her child was near and stepping on him. *Id.* at 5. Plaintiff also stated that Officer Holmes' conduct in stepping on the baby violated the Fourth Amendment. *Id.* at 7. In her deposition, Plaintiff testified that she saw a police officer kick her baby in the face. ECF Dkt. #66-1 at 72. Plaintiff further testified that she told the officers that her baby was on the ground. *Id.* at 73. She indicated that she felt that the kick was intentional because she told the officers her baby was on the ground and they did not check. *Id.* When asked at deposition whether she told medical personnel that she did not see her baby get kicked, Plaintiff responded that the medical report was in error as she did see Demetrius get kicked. *Id.* at 73.

Defendants assert that the Court should find that Plaintiffs have abandoned their claims on behalf of Demetrius because they failed to dispute or address any of the arguments that they advanced in their motion for summary judgment. ECF Dkt. #73 at 6. Defendants also assert that the Fourth Amendment does not apply to § 1983 claims "which seek remuneration for physical injuries inadvertently inflicted upon an innocent party by police officers' use of force while attempting to seize a perpetrator." ECF Dkt. #67 at 12, quoting *Claybrook v. Birchwell*, 199 F.3d 350, 359 (6th Cir. 2000). Defendants reason that those that are not the deliberate objects of police officers' exertion of force have constitutional tort claims under the substantive due process clause of the Fourteenth Amendment, which requires that an officer be held liable for his conduct towards a citizen if the conduct "shocks the conscience." *Id.*

The Court has reviewed Defendants' brief and agrees that pursuant to *Claybrook*, the proper claim to bring on behalf of Demetrius is that under the Fourteenth Amendment and not the Fourth Amendment. In *Claybrook*, the Sixth Circuit Court of Appeals held that "those collaterally injured by police conduct who were not intended targets of an attempted official 'seizure' are adjudged according to substantive due process norms." 199 F.3d at 359, citing *County of Sacramento v. Lewis*, 523 U.S. 833, 118 S.Ct. 1708, 1714-16, 140 L.Ed.2d 1043 (1998). Accordingly, the proper way to adjudicate whether to hold an officer or state official liable is one in which the police conduct towards a citizen "shocks the conscience." *Id*. The Sixth Circuit set forth two different standards for determining whether police conduct towards a citizen "shocks the conscience." *Claybrook*, 199 F.3d at 359, citing *Lewis*, 118 S.Ct. at 1717. The first is the deliberate indifference standard, which applies when the officer had a reasonable opportunity to deliberate various alternatives before deciding to take a certain course of action and took such action with deliberate indifference towards the plaintiff's federally protected rights, such as when correctional officials ignore the serious medical needs of an inmate. *Claybrook*, 199 F.3d at 359, citing *Lewis*, 118 S.Ct. at 1719. The other "shocks the conscience" standard applies where there is a "rapidly evolving, fluid, and dangerous predicament which precludes the luxury of calm and reflective pre-response deliberation." *Claybrook*, 199 F.3d at 359, citing *Lewis*, 118 S.Ct. at 1720 (citation omitted). This "shocks the conscience" standard applies to hold an officer liable "only if they involved force employed "maliciously and sadistically for the very purpose of causing harm" rather than "in a good faith effort to maintain or restore discipline[.]". *Id.*

The Court finds that the second "shocks the conscience" standard applies in the instant case because Officer Holmes was responding to a rapid, fluid, and potentially dangerous situation and had little to no time to deliberate. Plaintiff herself noted that there were a lot of people in the house, her mother was likely physically threatening her cousin, her cousin mentioned that he was going upstairs to get a gun, Plaintiff was yelling, and Plaintiff was continuing to disobey Officer Holmes' commands to put her hands behind her back after she was told that she was under arrest. ECF Dkt. #66-1 at 36, 38, 52; ECF Dkt. #67-2 at 5:12 through 5:40. Thus, in order to hold Officer Holmes liable under this standard, it must be shown that he kicked or stepped on Demetrius "maliciously and

-14-

sadistically for the very purpose of causing harm" rather than "in a good faith effort to maintain or restore discipline."

No evidence suggests that Officer Holmes acted in such a manner. He testified that he heard Plaintiff say "my baby, my baby," but he did not see a baby in the room until after Plaintiff was handcuffed and her family came in and turned the light on. ECF Dkt. #64-1 at 60. He testified that he was not aware of anyone stepping on or kicking a baby. *Id*. When asked if it appeared that Officer Holmes knew that the baby was on the ground, Plaintiff testified, "I told him. That should have been enough." ECF Dkt. #66-1 at 73. When asked if the kick was intentional, Plaintiff testified that she felt that it was because Officer Holmes did not check when she told him where her baby was. *Id*. She also testified that she thought that the kick was malicious because Officer Holmes should have looked and seen where he was going after she told him where her baby was. *Id*. at 61. Plaintiff testified that then eight month old Demetrius was swaddled in a blanket next to the couch in the big room where she was arrested and tased and his head, arms and hands could be seen. *Id*. The audio recording does not provide a lot of detail or clarity, except Plaintiff is heard saying something about her baby during her arrest and tasering. ECF Dkt. #67-2 at 5:23 through 5:28.

Accordingly, insufficient evidence exists to show that Officer Holmes acted maliciously and sadistically for the very purpose of causing harm to Demetrius. Accordingly, the Court GRANTS summary judgment in favor of Officer Holmes on Plaintiffs' claim that he used excessive force against Demetrius. ECF Dkt. #67.

### C.    CLAIMS AGAINST CITY OF WARREN POLICE DEPARTMENT

Defendants also move for summary judgment as to Plaintiffs' claims against the Warren PD, first asserting that it is not sui juris and therefore cannot be sued. ECF Dkt. #67 at 20-21. Plaintiff does not address this assertion in her opposition to the motion for summary judgment. ECF Dkt. #71. Defendant also asserts that even if Plaintiff properly sued Warren PD, it is entitled to judgment as a matter of law because it cannot be held liable for any alleged failure to train or to implement policies and procedures to prevent injuries to Plaintiff and her baby when no constitutional violation has been committed. ECF Dkt. #67 at 17. Plaintiff also fails to address this assertion in her opposition brief. ECF Dkt. #71.

The Court GRANTS summary judgment in favor of Warren PD on Plaintiffs' very generalized claims that it "failed to implement set policies and/or procedures that could have prevented the injuries to the Plaintiffs and all Defendants failed to follow the set policies or procedures that did exist that could have minimized Plaintiffs[sic] injuries." ECF Dkt. #2 at 2. Since the Court has found that Officer Holmes did not commit a constitutional violation, Warren PD cannot be held liable as a matter of law under § 1983 for any claim or theory of failure to train, supervise or implement any practice or procedure in this case. A city cannot be held liable under § 1983 for police conduct that inflicts no constitutional injury. *Peet v. City of Detroit*, 502 F.3d 557, 566 (6th Cir. 2007). Moreover, as pointed out by Defendants, Warren PD is not sui juris and therefore cannot be sued § 1983. A municipal police department is an administrative unit of a local government and as such is not sui juris because it lacks the power to sue, and cannot be sued absent positive statutory authority. *Elkins v. Summit County, Ohio*, No. 5:06-CV-3004, 2008 WL 622038, at *6 (N.D. Ohio, Mar. 5, 2008), unpublished, citing *Papp v. Snyder*, 81 F.Supp.2d 852, 857 n. 4 (N.D.Ohio 2000). The Warren PD is sui juris and Plaintiff cites to no express statutory authority allowing the Warren PD to be sued.

## IV.    CONCLUSION

For the foregoing reasons, the Court GRANTS Defendants' motion for summary judgment and DISMISSES Plaintiffs' complaint in its entirety WITH PREJUDICE. ECF Dkt. #67.

IT IS SO ORDERED.

SIGNED AND ENTERED on this 24th day of February, 2014.

    */s/ George J. Limbert*
GEORGE J. LIMBERT
UNITED STATES MAGISTRATE JUDGE

-16-